## NORTHWESTERN TRANSP. CO. v. LEITER.

(Circuit Court of Appeals, Seventh Circuit. April 9, 1901.)

### No. 724.

SHIPPING—INJURY TO CARGO IN PORT—NEGLIGENCE.

After a barge had been loaded with a cargo of wheat in January, and while lying in the Chicago river, awaiting the opening of lake navigation in the spring, a drain pipe which passed through the hold above the wheat, and the lower part of which was below the surface of the river, so that it remained full of water, froze and burst, and water from the river ran in upon the cargo. The shipkeeper in charge for the owners knew that water was entering the vessel, but, on the supposition that it came in from a different place, made no examination for a month, although he could easily have done so; and during all that time the water continued to run in upon the wheat, doing it serious damage. *Held*, that the result should reasonably have been anticipated, and that, moreover, the keeper was guilty of gross negligence, which rendered the owner of the vessel liable for the injury to the cargo, irrespective of the obligation assumed under the bill of lading to deliver the cargo safely at the

port of destination, dangers of navigation. fire, and collision alone excepted.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The declaration in this case is in assumpsit upon a bill of lading, a copy of which is attached to the pleading, and contains four counts, the substance of which is stated in the brief for the defendant in error (the plaintiff below) as follows: "The first sets out the shipment of the grain on the vessel in good order and condition, and defendant's undertaking to take care of and safely and securely carry and convey the wheat on board of the Hartnell to Buffalo, Erie, or Fairport, and there to safely and securely deliver the same in like good order and condition, dangers of navigation, fire, and collisions only excepted; the second, the shipment, and the undertaking to take care of and safely hold the grain on board of the Hartnell at Chicago until the opening of lake navigation, and then to safely and securely carry and convey it on board the Hartnell to Buffalo, Erie, or Fairport, and there safely and securely deliver it in like good order and condition, dangers of navigation, fire, and collisions excepted; the third, the delivery of the grain to the defendant on board of its vessel, to be taken care of, held, and safely carried by it from Chicago to Buffalo, Erie, or Fairport, and at one of these places to be safely delivered for the plaintiff, and the contract of the defendant to take due and proper care of the grain whilst it should have the care and custody thereof for the purpose aforesaid; and the fourth, the general allegation that the defendant had the care and custody of the grain for the plaintiff, and in consideration thereof undertook and promised to take due and proper care thereof whilst it had the care and custody of the same. The counts all allege the breach of the contract stated, and that by and through the mere carelessness and negligence of the defendant and its servants the grain was greatly damaged, injured, and lessened in value. All of these counts contain proper averments of consideration and other formal matters."

The following is a copy of the bill of lading, signatures omitted:

"Chicago, January 21, 1898.

"Shipped in good order and condition by Allen, Greer & Zeller Co., as agent and forwarder, for account and at risk of whom it may concern, on board the b'ge George E. Hartnell, whereof ———— is master, now in the port of Chicago, bound for Buffalo, Erie, or Fairport, the following articles, as here marked and described, to be delivered in like good order and condition as addressed on the margin, or to his or their assigns or consignees, upon paying the freight and charges as noted below. All the deficiency in cargo to be paid for by the carrier and deducted from the freight, and any excess in the cargo to be paid for to the carrier by the consignees. In case grain becomes heated while in transit, the carrier shall deliver his entire cargo, and pay only for any deficiency caused by heating exceeding five bushels for each 1,000 bushels. (The dangers of navigation, fire, and collisions excepted.) *, * * Order. (171,000) Allen, Greer & Zeller Co. One hundred and seventy-one thousand one northern spring wheat, lake freight to Buffalo, Erie or Fairport, is 2½ (two and one-half) cents per bushel, including holding in Chicago and lake freight, spring of 1898. Shippers have privileges to unload in part or whole of cargo at their expense, and substitute another, without any additional freight."

The defendant pleaded the general issue. There was a verdict and judgment for the plaintiff in the sum of $4,926.34, an amount of which there is no question if there should have been a recovery for any sum. The assignment of errors contains nineteen specifications, most of which might be rejected for want of form or substance. Adams v. Shirk, 43 C. C. A. 407, 104 Fed. 54; Columbus Const. Co. v. Crane Co., 40 C. C. A. 35, 98 Fed. 946; Id., 41 C. C. A. 189, 101 Fed. 55; Stewart v. Morris, 37 C. C. A. 562, 96 Fed. 703; U. S. v. Indian Grave Drainage Dist., 29 C. C. A. 578, 85 Fed. 928. But the refusal of the court to direct a verdict for the defendant is chiefly relied upon. The defendant in error, besides denying upon any theory of the case the errors assigned, insists that, irrespective of any question of negligence, the liability

of the plaintiff in error is established by the contract sued upon,—the bill of lading,—and in support of this proposition cites Transportation Co. v. Tuckerman, 33 N. J. Law, 543; Willett v. Rich, 142 Mass. 356, 7 N. E. 776; Kay v. Wheeler, L. R. 2 C. P. 302; The Harriman, 9 Wall. 161, 19 L. Ed. 629; The Delaware, 14 Wall. 579, 20 L. Ed. 779; Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093.

Frank Masten and C. W. Greenfield, for plaintiff in error.

William E. Church, for defendant in error.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

The course given to the trial resulted in the introduction and the offering of a mass of evidence—particularly about the construction and seaworthiness of the Hartnell—which, once the cause of the loss had been developed, became totally irrelevant and immaterial. The essential facts are within a narrow compass. The clear weight of the evidence which has any bearing on the question of liability shows, and the fact is practically admitted, that the injury to the cargo occurred while the barge was in the river at Chicago, between January 21st, the date of loading, and April 9th, when, upon the opening of navigation, the voyage to Buffalo, which the shippers had designated as the port of delivery, began. It was left to the jury to determine whether the damage was caused in port or on the voyage, upon instructions to the effect that while the vessel was in port the owner was bound to exercise only the ordinary care of a warehouseman, and while on the voyage the obligation was that of a common carrier, except as limited by the waybill.

The basis of the contention that the court should have directed a verdict for the defendant is that there was no evidence of negligence on the part of the owners while the barge was in port at Chicago. The terms of the bill of lading and the authorities cited lend strong support to the proposition that the question of negligence should have been excluded from the case, the liability of the plaintiff in error being established by a special contract which stipulated for a delivery of the cargo in good order, specified risks excepted; but it is not found necessary to pass upon that point. The evidence to justify the submission of the question of negligence to the jury was not only ample; it was so clear that, if a contrary verdict had been returned, it would have been the duty of the court to set it aside. The court might well have directed the verdict which the jury found. The cause of the injury was a leak from a small drainage pipe which passed through the boiler deck into the cargo hold immediately beneath the donkey pump, and ran under the deck for the distance of about fourteen feet towards the port side of the vessel, with a fall of six or eight inches. until it met and was tapped into a scupper pipe, which, coming down vertically through the boiler deck at the port side, had an outward discharge. The draft of the vessel, as loaded, was such as to bring the portion of the drainage pipe under the deck below the surface of the river, and no means were employed to prevent the inflow of water. The result ought to have been anticipated. The water in the drainage pipe, about the

first of February, froze and burst the pipe, and through a fissure near six inches in length water from the river flowed into the cargo for more than a month before the leak was discovered. It was inexcusable, not to say gross negligence, that the discovery was not made promptly and before serious harm had resulted. There was ample warning. The shipkeeper in charge testified that it was about nine or ten days after the boat was loaded before he noticed "any indication of a leak"; that he then saw water "coming down through her timbers"; that he "did not think it was coming through on the cargo"; that he "thought the water was coming down through the top of the water bottom"; that "probably there had been ice in there that thawed"; that on the 8th of March, at the second pumping out of the well, he "noticed an odor from the wheat, a fermented, sour smell," and then, taking a lantern, he opened the manhole and went into the hold, and when there could hear the noise of running water. "Up to that time," he testified, "I had no knowledge or notice that the water was coming in contact with the cargo." His opinion of notice was quite inadequate. He had notice upon which his own sense of prudence, in proper regard for the interests of his employers, should have impelled him to an immediate search for the origin and course of the water which he saw running, instead of contenting himself with a mere supposition, of the reasonableness of which no evidence was offered. As the representative of the owners of the vessel, he was bound to have and to exercise all the intelligence and prudence required of them. He therefore knew of the drainage pipe, filled with the water of the river and all the while exposed to the cold of the season, and, when he found flowing into the well of the barge water which might be coming from a break in that pipe,—quite as likely as to be coming "from the bilge ceiling,"—his plain duty was then, as finally he recognized it, to make the examination necessary, and not difficult, to determine the truth, or at least to know that the cargo was not being harmed. The only excuse offered for the failure is the custom of fastening down the hatches of loaded vessels in order to prevent tampering with the cargoes; but, if pertinent, that would be plainly an inadequate excuse for permitting the destruction of a cargo by hatch-hidden causes. It is not a pertinent excuse, because the examination could have been made upon the first warning, as it was finally made, by means of the manhole, without disturbing the hatches.

The verdict and judgment rendered are so clearly right upon the merits—which the motion for a peremptory charge has compelled us to examine—as to deprive the other questions sought to be raised of material significance. We have, however, looked far enough into them to be satisfied that on any theory of the case they are unimportant. The judgment below is affirmed.